# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

### CIVIL NO. 1:03CV298

| | | |
|---|---|---|
| WORD OF FAITH FELLOWSHIP, INC.;<br>STEVEN A.D. and CYNTHIA G. CORDES;<br>RICKY F. and SUZANNE M. COOPER;<br>JENNIFER LOU MOORE; KIM R. WAITES;<br>DAVID CAMERON and JAYNE K.<br>CAULDER; VIRGINIA ANNE CABLE;<br>DENISE M. WORLEY; PATRICIA P. DOLAN;<br>JASON and TANJA GROSS; MARCIA<br>WHITBECK; GILBERTO CARMONA; JAY<br>and SUSAN PLUMMER, all individually and<br>on behalf of their minor children; CODY RYAN<br>HAWKINS; and JOVEILLE D. CLARK, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| Vs. | )<br>) | **MEMORANDUM AND ORDER** |
| RUTHERFORD COUNTY DEPARTMENT OF<br>SOCIAL SERVICES; STEVE WRIGHT, in<br>his official capacity as Chairman of The<br>Rutherford County Board of Commissioners;<br>JOHN CARROLL, individually, and in his<br>capacity as Director of the Rutherford County<br>Department of Social Services; LYNN HOPES,<br>individually and in her capacity as Rutherford<br>County Department of Social Services Child<br>Protective Supervisor; and MELANIE<br>TAYLOR, individually and in her capacity as<br>Rutherford County Department of Social<br>Services Caseworker, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

THIS MATTER is before the Court on the Defendants' motion to dismiss and the

Plaintiffs' request for oral argument.

# I. STATEMENT OF FACTS

The Plaintiffs in this case are the Word of Faith Fellowship ("WFF"), a North Carolina not-for-profit religious corporation, and members of WFF who sue on their own behalf and on behalf of their children. **Complaint, filed December 5, 2003, ¶¶ 13-14.** The individual Plaintiffs, with the exception of Plaintiffs Jay Plummer, Susan Plummer, Cody Hawkins, and Joveille Clark, claim that they have "been and continue to be subjected to unconstitutional threats and harassment" mostly in the form of sham investigations by Defendants. *Id.,* **¶ 14.** Plaintiffs Hawkins and Clark "are recently emancipated WFF members who [claim to have been] subjected to constitutional deprivations by defendants while minors." *Id.,* **¶ 15.** The Plummers have not been investigated by Defendants, but they claim that Defendants proselytized to their children and falsely suggested to one of their children that he had been physically abused. *Id.,* **¶ 16, 59, 72.**

## A.    Plaintiffs' Religious Beliefs and Practices

Plaintiffs describe WFF as a "nondenominational, evangelical, charismatic Christian church." *Id.,* **¶ 22.** WFF believes in the practice of "strong prayer" or "blasting prayer," which includes "supplication, petition, weeping, groaning, travail, crying out, praying in tongues, and shrill cries for Christ to be formed in you and to come against the works of the devil." *Id.,* **¶ 24.** Strong prayer also includes "strong preaching, teaching, praising God or singing." *Id.* Another of WFF's practices is called "discipleship," which requires church members to "spend time alone with God, pray, read scriptures, and listen to tapes containing religious teaching." *Id.,* **¶ 27.**

WFF operates a day school, the Word of Faith Christian School ("WFCS"), for children from kindergarten through twelfth grade, and the church operates a nursery for younger children. *Id.,* ¶ **22.** At WFCS, students who engage in disruptive behavior are removed from the regular classroom and put in discipleship. Plaintiffs compare the practice to the public schools' in-school suspension policy and emphasize that school employees supervise the students in discipleship and provide them with academic instruction. *Id.,* ¶ **27.** During discipleship, "students are taught to get before God, inquiring of Him to change their lifestyle." *Id.* Plaintiffs acknowledge that a child's contact with peers, friends, and family may be limited during the in-school portion of discipleship, but they maintain that "discipleship training does not involve 'isolation.'" *Id.*

WFF believes in the use of corporal punishment at WFCS and administers it, in accordance with N.C. Gen. Stat. § 115C-390. *Id.,* ¶ **28.** Plaintiffs maintain that WFCS administers corporal punishment only after other interventions have failed and a parent or guardian has consented. Corporal punishment at WFCS consists of "one to three swats . . . on the fully clothed posterior." *Id.* Plaintiffs do not practice corporal punishment in the church nursery. *Id.,* ¶ **29.**

**B.     The 1995 Investigation**

Plaintiffs allege that Defendant Rutherford County Department of Social Services ("DSS") first acted improperly in 1995 after the television show *Inside Edition* made false statements about WFF. *Id.,* ¶ **30.** Although the complaint states that "[s]trong prayer is never used as a form of punishment or discipline of children," DSS claimed that WFF used strong

prayer as "'a means of modifying the child's behavior.'" *Id.,* ¶¶ **24, 30.** DSS opened

investigations against seven WFF families including Plaintiffs Ricky and Suzanne Cooper. *Id.,* ¶

**30.** According to Plaintiffs, DSS "never interviewed the alleged perpetrators of the abuse, never

viewed the religious practice of strong prayer, and never requested or conducted any psychiatric

or psychological testing of the children to determine whether strong prayer meets the statutory

definitions of emotional abuse." *Id.,* ¶ **31.** During these investigations, DSS removed a 10-year-

old girl from her home and held her until a state court rejected DSS's charges of abuse. *Id.,* ¶ **30.**

Even after the state court rejected DSS's allegations, DSS sent letters to seven WFF families,

including the Coopers, "in which RCDSS purported to substantiate allegations of abuse and

neglect against the parents solely based on allegations of strong prayer at the Church Nursery."

*Id.,* ¶ **32.** Plaintiffs claim that the letters are still on file at the Central Registry of the North

Carolina Department of Social Services and prevent the recipients from adopting children and

from serving as references for parents seeking to adopt. *Id.,* ¶ **33.** Furthermore, Plaintiffs claim

that the letters cause them to fear that they "will be penalized or harassed" for engaging in strong

prayer. *Id.*


**C.      The 2000 Investigation**

DSS's next challenged behavior occurred in 2000. During the summer of that year, WFF

members Ryan Millwood, Pamela McGee, and Plaintiff Virginia Anne Cable were all involved

in custody disputes. *Id.,* ¶ **34.** DSS initiated investigations against the three WFF members

involved in the disputes. *Id.* Plaintiffs allege that DSS initiated the investigations because of

allegations from the non-WFF parents that the children were being subjected to harmful strong

prayer and were enduring excessive corporal punishment. *Id.* During the course of one investigation, Rutherford County District Court Judge Randy Pool issued an oral order finding that strong prayer and corporal punishment posed potential harm to the McGee children, but Judge Pool still ordered that Pamela McGee, a WFF member, have primary custody. *Id.,* ¶ 35.

Also during the course of these investigations, DSS asked Jane Whaley, the pastor of WFF, to sign a "Protection Plan Agreement" that would apply to all children under eighteen years old that attend WFF. *Id.,* ¶ 36. The Plan would require that "'(1) No child at [WFF] will be subjected to any physical restraints, or to any shouting, screaming, or *praying loudly* in close proximity to the child;' and '(2) No child at [WFF] will be corporally punished by anyone other than the parents of the child and any such punishment shall not be done in a manner that will cause physical injury, bruises or contusions on the child.'" *Id.,* ¶ 37 **[alterations and emphasis in original]**. DSS threatened to remove all children of WFF members from their parents' custody if Whaley did not sign the protection plan. *Id.,* ¶ 38. When asked to explain the terms of the plan, DSS stated that "groaning 'Oh God, Help Me, Oh God, Help Me' would be banned" and that it was possible that 400 people praying softly together could be loud enough to violate the protection plan. *Id.,* ¶ 39. Whaley refused to sign the plan. *Id.,* ¶ 38.

After Whaley's refusal, DSS ordered several psychological evaluations of the children from the three families under investigation. In late September 2001, DSS closed the three investigations with no findings of "abuse, neglect or dependency" against the WFF members. *Id.,* ¶¶ 41-43.

**D.    The Ongoing Investigations**

Since 2002, Plaintiffs contend DSS has opened over a dozen investigations against WFF families including all of the Plaintiffs except the Plummers and the two recently emancipated minors, Hawkins and Clark. *Id.,* ¶¶ **44, 48, 52.** The complaint alleges that the "purpose of these investigations has been, and continues to be, to harass and to intimidate these families and the Church because of their religious beliefs and practices." *Id.,* ¶ **53.** Plaintiffs further contend that, although DSS procedures call for the agency to limit investigations to thirty days, DSS has refused to close many of these cases even after acknowledging that there is not enough evidence to proceed. *Id.,* ¶¶ **44, 56-57, 62.** Furthermore, DSS did not inform any families of the investigations' status until late October 2003, and DSS still has not substantiated any of the claims it is investigating. *Id.*

In addition to the investigations of WFF members, DSS also opened an investigation of the church nursery in January 2003 to determine whether the nursery was using inappropriate techniques to discipline children. *Id.,* ¶ **58.** Plaintiffs claim that DSS knew when it began the investigation that it had no authority to investigate the church nursery because the nursery does not meet the statutory definition of a "child care facility" as defined under N.C. Gen. Stat. §§ 110-86 (2), (3). *Id.* Indeed, DSS enlisted the aid of the North Carolina Department of Health and Human Services Division of Child Development, but that agency closed its investigation after concluding "that the Church Nursery was not a child care facility subject to state licensing." *Id.,* ¶ **61.**

Despite regulations requiring DSS to interview alleged perpetrators of abuse, the agency made no attempt to interview the church nursery volunteers. *Id.,* ¶ **60.** Defendant Melanie

Taylor, a DSS caseworker, did extensively interview children as young as one year old, including the Plummer children, on topics such as prayer and "whether God deals with their hearts." *Id.,* ¶ **59.** Plaintiffs contend that Taylor made statements to the children about her own religious beliefs and that the interviews upset and confused the children. *Id.* Plaintiffs further contend that DSS's investigation of the nursery was "impermissibly based primarily on the religious practices of strong prayer." *Id.,* ¶ **58.**

Plaintiffs claim that DSS initiated these investigations based upon information from former WFF members who DSS should have known to be unreliable. For example, Plaintiffs claim that DSS relied on allegations from former WFF member Shana Muse, a convicted felon and drug user who has lost custody of her own children because of abuse and neglect. *Id.,* ¶ **45.** Plaintiffs also allege that Muse is involved with an "anti-cult" business known as Wellspring that charges a substantial fee to "deprogram" cult members. *Id.,* ¶ **46.** According to Plaintiffs, DSS used information that it knew to be unreliable "as the basis for a new and far-reaching assault on plaintiffs because of their religious beliefs and practices." *Id.,* ¶ **47.**

The Plaintiffs state that the investigations have been mostly based on WFF's practices of strong prayer and discipleship. *Id.,* ¶ **53.** They state that there have also been allegations of corporal punishment, that DSS knows those allegations to be false, and uses them "as an excuse to harass and threaten plaintiffs." *Id.,* ¶ **54.** To support this claim, Plaintiffs give several examples. In one case, they allege DSS has continually changed the dates the alleged corporal punishment was to have taken place, and that in another case, DSS used an allegation that a child was locked in a laundry room to question other children about strong prayer. *Id.* Plaintiffs also

state that DSS's failure to follow its own rules requiring its agents to interview the parents of alleged victims shows that DSS is using its investigation to harass Plaintiffs illegally. *Id.,* ¶ **55.**

### E.     Coercive Tactics

Plaintiffs allege that DSS has used heavy-handed and coercive tactics to intimidate WFF members, especially children, into making statements indicating that WFF members, WFCS personnel, and church nursery personnel treat children improperly. Plaintiffs claim that DSS has asked young children whether they would like to leave WFF and WFCS and even whether they would like to leave their homes. *Id.,* ¶ **63.** Plaintiffs further allege that DSS has facilitated communications between Wellspring associates and WFF children and has made unsolicited offers to help children leave their parents. *Id.*

Plaintiffs cite specific instances of such alleged conduct. For example, Plaintiffs allege that Defendant Taylor told the parents of Plaintiff Joveille Clark, then age 17, that DSS intended to take all WFF children from their parents, that DSS wanted to "'lock up and close'" WFF, that WFF was a cult, that she hated WFF, and that its members are "'slaves' and 'weak-minded.'" *Id.,* ¶ **49.** Defendants then took Clark to a "deprogrammer" where he was held against his will for two days. *Id.* The complaint does not state that Defendants took Clark against his parents' will. Plaintiffs allege that DSS suggested to nine-year-old Danielle Cordes and 16-year-old Amy Whitbeck that they may want to leave their parents. *Id.,* ¶ **64.** Plaintiffs further allege that DSS employees gave Plaintiff Cody Ryan Hawkins, then a minor, a letter from a Wellspring associate and offered to help him leave WFF. *Id.,* 65.

Plaintiffs claim that DSS has interrogated children under nine-years old on complicated religious topics and have revealed to these children DSS's hostility toward their church's beliefs. *Id.,* ¶¶ **66-67.** Plaintiffs even claim that Defendant Taylor has criticized WFF's religious beliefs on dating and has suggested to Plaintiff Hawkins, that, if he would leave WFF, he would have a successful dating life and could listen to popular music. *Id.,* ¶ **68.** The complaint also alleges that Defendants forced one nine-year-old to listen to "Christian music" and demanded to know why she did not want to hear it. *Id.,* ¶ **66.** Plaintiffs further claim that DSS has suggested to young children that they have been abused, that they want to leave WFF, and that their parents want to leave WFF. *Id.,* ¶¶ **71-72.**

Another coercive tactic that Plaintiffs allege is DSS's practice of threatening to take children from WFF parents unless the parents sign "Safety Assessments" which limit the parents' rights to have their children participate in "strong prayer." For example, DSS required Plaintiff Kim Waites to sign a safety assessment prohibiting her from having her daughter participate in strong prayer and from disciplining her daughter in a way that would leave "marks or bruises." *Id.,* ¶ **70.** Plaintiffs claim that there were no allegations that the Waites child had been disciplined in a way that would leave marks or bruises and that DSS would not meet with Waites's husband when he wished to refute DSS's insinuations of improper discipline. *Id.* Plaintiffs further claim that the Defendants have expressed their intention to require all WFF parents to sign safety assessments or lose custody of their children. *Id.,* ¶ **75.**

The complaint makes additional allegations that on numerous occasions, DSS workers, especially Defendants Taylor and Lynn Hoppes, have come to WFCS and demanded to speak with children alone. *Id.,* ¶ **73.** DSS workers have taken these children into a worker's car and

interrogated the children for up to 45 minutes. *Id.* When Cynthia Cordes refused to allow DSS to interrogate her daughter in this manner, DSS alleged that Cordes was obstructing a DSS investigation. *Id.*

Finally, Plaintiffs allege that DSS twice requested that WFF Pastors Sam and Jane Whaley provide lists of children attending WFF. *Id.,* ¶ 40, 73. On at least one of these occasions, Plaintiffs allege that DSS requested the children's addresses and the addresses of their parents. *Id.,* ¶ 40. Following the Whaleys' refusal of one request, DSS alleged that the Whaleys were obstructing an investigation. *Id.,* ¶ 73.

## F.      Deviations from DSS Procedure

Some alleged deviations from DSS regulations have been discussed above. The complaint emphasizes, however, that DSS has deviated from the procedures prescribed by North Carolina and federal law. For example, DSS has failed to interview parents of alleged victims and the alleged perpetrators of violations. Furthermore, DSS has kept investigations open much longer than permitted and has leaked confidential information to the press. *Id.,* ¶ 77, 79. It is the Plaintiffs' contention that DSS has deviated from their procedures in an attempt "to subvert plaintiffs' protected religious practices." *Id.,* ¶ 78.

## II. DISCUSSION

## A.      Standard of review.

Defendants have moved to dismiss the complaint on the grounds that it fails to state a claim upon which relief can be granted. **Defendants' Motion to Dismiss; Memorandum and**

**Points of Authorities in Support Thereof ["Motion to Dismiss"], filed January 22, 2004.** In ruling on a motion pursuant to Rule 12(b)(6) to dismiss for failure to state a claim, the Court must "accept the factual allegations in the Plaintiffs' complaint and must construe those facts in the light most favorable to the Plaintiffs. . . . [Dismissal may occur] only if it appears beyond doubt that the Plaintiffs can prove no set of facts in support of their claim that would entitle them to relief." *Flood v. New Hanover County,* 125 F.3d 249, 251 (4th Cir. 1997); **Shepard's, *Motions in Federal Court,* § 5.124, at 367 (2d ed. 1991).** Conclusory allegations are examined in light of the factual claims. **Id.** Nonetheless, dismissal is appropriate if "it appears to a certainty that the plaintiff[s] would be entitled to no relief under any state of facts which could be provided in support of [their] claim." *Mylan Lab., Inc. v. Matkari,* **7 F.3d 1130, 1134 n.4 (4th Cir. 1993) (internal quotation marks and citations omitted).**

**B.      North Carolina Constitutional claims.**

The Defendants' motion to dismiss focuses almost exclusively on the claims that Plaintiffs assert under the United States Constitution. In a footnote, Defendants argue that Plaintiffs' North Carolina constitutional claims are barred because they have failed to demonstrate the lack of an adequate state law remedy. **Motion to Dismiss, at 2 n.1 (citing *Corum v. Univ. of N.C.,* 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992)).** But Defendants do not assert that Plaintiffs have a state law remedy, and the complaint does not demand relief under any source of state law other than the North Carolina Constitution. North Carolina courts do not appear to have addressed the question of whether a plaintiff must affirmatively plead the lack of a

state law remedy or whether a defendant must plead the existence of one, but the Court can find no precedent for dismissing a constitutional claim under *Corum* where there was no readily apparent state law remedy. Here, Plaintiffs' claims are quintessentially constitutional in nature; Defendants suggest no state law remedy; nor is there one that is readily apparent. As such, the Court finds that Plaintiffs' North Carolina constitutional claims are not barred by *Corum*.

Neither party analyzes Plaintiffs' state constitutional claims differently than the corresponding federal constitutional claims. In fact, Defendants implicitly concede that, if the Court rejects their *Corum* analysis, there are no arguments for dismissing the state constitutional claims beyond those arguments that the Defendants assert as to the federal claims. *Id.* Defendants cite North Carolina law suggesting that the state constitutional claims should be analyzed under the same standards as the federal claims. *Id.* **(citing *Lorbacher v. Housing Auth. of Raleigh*, 127 N.C. App. 663, 675, 493 S.E.2d 74, 81 (1997); *State v. Johnson*, 98 N.C. App. 290, 297, 390 S.E.2d 707, 711 (1990)).** Therefore, the Court's analysis of Plaintiffs' federal claims will apply to their state constitutional claims as well.

## C. Plaintiffs' claims.

### 1. Free exercise of religion.

The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits government policies "designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest." ***Booth v. Maryland,*** **327 F.3d 377, 380 (4th Cir. 2003).** The Plaintiffs

allege that the Defendants, undoubtedly state actors, have initiated investigations and threatened

to remove children from their parents' homes in order "to harass and to intimidate these families

and the Church because of their religious beliefs and practices." **Complaint, ¶ 53.** Under the

auspices of enforcing state law, Defendants have threatened to remove the children of *all* WFF

parents who refuse to sign "Safety Assessments," have enticed children to reject their parents'

religion, and have stated their intention to "lock up and close" WFF. *Id.,* **¶¶ 49, 65, 68, 71, 72,**

**75.** These allegations clearly describe a policy designed to suppress religious beliefs and

practices. While the Court acknowledges the state's obvious and legitimate interest in protecting

the welfare of its children, one can hardly describe Defendants' means as being "narrowly

tailored." *See, Hodge v. Jones,* **31 F.3d 157, 164 (4th Cir. 1994).** Therefore, Plaintiffs have

stated a claim for an Establishment Clause violation.

Defendants argue that Plaintiffs' claim should not survive this motion because the

Defendants were merely carrying out their statutory duty to enforce laws against child abuse

which are both neutral and generally applicable. **Motion to Dismiss, at 8-10.** Indeed, a "law

that is neutral and of general applicability need not be justified by a compelling governmental

interest even if the law has the incidental effect of burdening a particular religious practice."

*Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah,* **508 U.S. 520, 531 (1993).**

However, Plaintiffs' argument is not that they should be excused from illegal conduct because of

their religion. They claim, rather, that the Defendants are targeting them with harassing

investigations and strict enforcement of the law because of their religion. *See* **Complaint, ¶ 53.**

The Fourth Circuit has held that a plaintiff makes out an Establishment Clause case by alleging

"that the facially neutral policy is being applied in a discriminatory manner." ***Booth, supra,* at**

**381.** Therefore, *Lukumi's* statement as to the constitutionality of neutral, generally applicable policies is not relevant to this case. Plaintiffs allege the laws are being applied selectively. Under *Booth,* this is clearly sufficient to allege a violation of the Establishment Clause.

## 2. Right to familial relations.

Plaintiffs claim the Defendants have deprived them of their substantive due process right to "raise their children as they see fit, including within a particular religion." **Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Opposition"), filed February 23, 2004, at 21 n.11.** The Fourth Circuit has held that "the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." *Hodge, supra,* **at 163.** That Court has also held that "[t]he bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons." *Jordan by Jordan v. Jackson,* **15 F.3d 333, 343 (4th Cir. 1994).** But "[t]he maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest." *Hodge, supra,* **at 163-64.** "'The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations.'" *Id.,* **at 164 (quoting *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir. 1993)).**

Since Plaintiffs are under no obligation at this point to offer evidence in support of their allegations, the Court must accept as true the allegations that the Defendants went beyond simply investigating reports of child abuse and actually enticed children to leave their parents' homes

and to reject their parents' religion. *See, e.g.,* **Complaint, ¶¶ 63, 64, 65, 68, 71, 72.** Such conduct would implicate the "most essential and basic aspect of familial privacy [–] the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman,* **566 F.2d 817, 825 (2d Cir. 1977).** Obviously, it is the Defendants' duty to interfere with the parent-child relationship under certain circumstances, and Defendants provide a necessary service to the community by doing so. But the facts that Plaintiffs have alleged do not describe a legitimate DSS investigation as much as they describe a campaign to drive a wedge between parents and their children for obviously illegitimate reasons and by clearly unacceptable means. Of course, Plaintiffs will have the burden of producing evidence to sustain these allegations, but at this stage of the case, such unproven allegations clearly describe a deprivation of the substantive liberties the Fourteenth Amendment guarantees.

### 3.     Denominational preference.

Plaintiffs claim the Defendants' actions demonstrate a preference for certain branches of Christianity over the Plaintiffs' religion and constitute a violation of the Establishment Clause. Most of the Defendants' alleged actions, however, are more properly challenged under the Free Exercise Clause. Courts often state, *in dicta,* that governmental action having a primary effect of advancing *or inhibiting* religion runs afoul of the Establishment Clause. *See, e.g., Lemon v. Kurtzman,* **403 U.S. 602, 612 (1971);** *Phan v. Commonwealth of Virginia,* **806 F.2d 516, 519 (4th Cir. 1986).** However, from a practical standpoint, governmental action that inhibits religious activity is much more neatly analyzed under the Free Exercise clause, and the overwhelming

majority of courts choose this route. Even the Supreme Court's holding in *Lemon,* providing the test for claims under the Establishment Clause, stated the Establishment clause was meant to protect citizens against "'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" ***Lemon, supra* (quoting *Walz v. Tax Commission,* 397 U.S. 664, 668 (1970)).** Given those stated policies for the Establishment Clause, and given that applying the Establishment Clause to all government actions that impede religion would render the Free Exercise Clause superflous, the Court will dismiss Plaintiffs' Establishment Clause claim as it pertains to Defendants' alleged attempts to impede Plaintiffs' religion.

However, Plaintiffs also allege the Defendants attempted to advance their own religious beliefs and to impose those beliefs on the Plaintiffs and their children by sharing their religious views with Plaintiffs' children and forcing them to listen to "Christian music." **Complaint, ¶¶ 59, 66.** These alleged actions have no apparent secular purpose and would have a primary effect of advancing Defendants' religion. As such, these alleged actions would constitute violations of the Establishment Clause. ***Lemon, supra* (holding that governmental actions violate the Establishment Clause if they have no secular purpose, have a primary effect of advancing religion, or foster excessive governmental entanglement with religion.)** Therefore, to the extent that Plaintiffs allege the Defendants attempted to impose their own religious beliefs on Plaintiffs and Plaintiffs' children, this claim survives the motion to dismiss. Plaintiffs' claims that Defendants simply acted with hostility toward their religion will be analyzed under the Free Exercise Clause, but do not state a claim under the Establishment Clause.

### 4.     Intentional discrimination on the basis of religion.

Plaintiffs claim that the Defendants actions "constitute intentional discrimination on the basis of religion, in violation of the First and Fourteenth Amendments, including the Equal Protection Clause." **Complaint, ¶ 90.** The Court has analyzed the Plaintiffs' claims under the two religion clauses of the First Amendment and has concluded the Plaintiffs state a claim under each of these clauses. This cause of action, as it pertains to those two clauses is, therefore, redundant. Plaintiffs employ this cause of action to allege for the first time that Defendants have violated the Equal Protection Clause of the Fourteenth Amendment. However, the Supreme Court and the Fourth Circuit have repeatedly refused to consider Equal Protection Claims that simply restate claims brought under the religion clauses. *See Sherbert v. Verner,* 374 U.S. 398, 410 (1963); *Prince v. Massachusetts,* 321 U.S. 158, 170 (1944); *Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1400 (4th Cir. 1990). Therefore, the Court will dismiss Plaintiffs' Equal Protection claim and this entire cause of action.

### 5.     Unreasonable searches and seizures.

Plaintiffs claim that the Defendants have conducted numerous unconstitutional searches and seizures by interviewing students at WFCS without their parents' consent. **Complaint, ¶¶ 73, 92.** The Fourth Amendment, incorporated against the states in the Fourteenth Amendment, guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." **U.S. Const. amend IV.** The Supreme Court has held that the Fourth Amendment restricts the government when it is

conducting civil, as well as criminal, investigations. *Marshall v. Barlow's, Inc.,* **436 U.S. 307,**

**312 (1978).** The Fourth Circuit has acknowledged the Fourth Amendment applies to social

workers involved in child abuse investigations but that "investigative home visits by social

workers are not subject to the same scrutiny as searches in the criminal context." *Wildauer v.*

*Frederick County,* **993 F.2d 369, 372 (4th Cir. 1993).** The Circuit, however, has never

articulated a clear standard by which social workers' investigations should be judged.

     For a plaintiff to state a violation of the Fourth Amendment based on a warrantless search

or seizure, he or she must have a legitimate expectation of privacy in the place where the search

or seizure occurred. *Minnesota v. Carter,* **525 U.S. 83, 88 (1998).** Although it is not binding

precedent, the Court accepts the conclusion of the Seventh Circuit that students in private schools

and their parents may reasonably expect privacy within the school. *Doe v. Heck,* **327 F.3d 492,**

**511-12 (7th Cir. 2003).** Furthermore, it is obvious that at least some of the Plaintiffs did, in fact,

expect this privacy. Plaintiff Cynthia Cordes refused to allow her child to be interviewed at

school. **Complaint, ¶ 73.** Therefore, these Plaintiffs had a subjective expectation of privacy that

was objectively reasonable.

     The next issue is whether the Plaintiffs' allegations describe a "search or seizure" in the

legal sense. Unquestionably, they do. The Supreme Court has held that a person is "seized"

when "in view of all of the circumstances surrounding the incident, a reasonable person would

have believed that he was not free to leave." *United States v. Mendenhall,* **446 U.S. 544, 554**

**(1980).** Quite clearly, children asked by government agents to enter the agents' car will feel

compelled to do so and to remain there until dismissed by those agents. Even if a child did feel

free to refuse to speak to government agents, DSS made it clear that these children were required to speak with them by threatening parents who objected to the questioning with obstructing an investigation. *Cf., In re Stumbo,* **357 N.C. 279, 298, 582 S.E.2d 255, 267 (2003) (Martin, J., concurring) (stating that no reasonable person would feel free to refuse an interview when doing so could lead to a contempt proceeding).** Therefore, the Plaintiffs have alleged a "seizure" under the Fourth Amendment. Since Plaintiffs have alleged a warrantless seizure occurring where Plaintiffs had a legitimate expectation of privacy, and since Defendants have failed to point to any exception to the warrant requirement, Plaintiffs have properly stated a claim of a Fourth Amendment violation. *See Coolidge v. New Hampshire,* **403 U.S. 443, 474 (1971).**

### 6. Free speech.

Plaintiffs claim that "Defendants have barred, and have attempted to bar, on threat of removal of children from their parents, plaintiffs from engaging in certain kinds of religious speech." **Plaintiffs' Opposition, at 28.** Specifically, Defendants have attempted to restrict the manner, particularly the volume, of Plaintiffs' speech by demanding that Plaintiffs sign "protection plans" and "safety assessments" that forbid them from engaging in strong prayer near children. **Complaint, ¶¶ 37, 39, 69.** Defendants have allegedly stated that groaning, "Oh God, Help Me, Oh God, Help Me," would be forbidden under these plans and that 400 individuals praying softly may be loud enough to violate the plans. **Complaint, ¶ 39.** Finally, Defendants allegedly asked the WFF pastor to lower the tone of her prayer until the DSS investigation was over. *Id.*

There is no doubt that prayer constitutes protected speech. ***Good News Club v. Milford Cent. Sch.,*** **533 U.S. 98, 110 (2001) (analyzing "live storytelling and prayer" as protected speech").** It is also well established that the government may "impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." ***Ward v. Rock Against Racism,*** **491 U.S. 781, 791 (1989) (internal quotation marks and citations omitted).** Defendants' alleged restrictions fail at least two prongs of this test.

First, one can reasonably infer from the complaint that the Defendants' restrictions on Plaintiffs' speech are part of a campaign motivated by Defendants' distaste for and desire to suppress Plaintiffs' religious views and practices. ***See,*** **Complaint, ¶ 53.** If Plaintiffs prove this to be true, then DSS would have "adopted a regulation of speech because of disagreement with the message it conveys," and such regulation would not be content neutral. ***Ward, supra.***

Second, the regulations the complaint describes are not narrowly tailored. The Supreme Court has explained that a time, place, and manner restriction may satisfy the narrow tailoring requirement even if it is not the least restrictive conceivable means of achieving a significant governmental interest. ***Id.,*** **at 798.** However, the Court qualified that statement by explaining that "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests." ***Id.,*** **at 799.** Although DSS's goal of protecting children is both significant and laudable, to do so by giving such a vague order as to cease "loud" prayer and even to cease collective soft prayer

delivers much too sweeping a blow. As such, Plaintiffs have properly claimed a violation of their right to Free Speech.

### 7.     Freedom of association.

Plaintiffs claim that Defendants have violated their "right to associate with others in pursuit of . . . religious . . . ends." *Roberts v. United States Jaycees,* **468 U.S. 609, 622 (1984).** In *Roberts*, the Supreme Court held the First Amendment implicitly grants the right to assemble for the purpose of engaging in activities, such as religious worship, that the First Amendment explicitly protects. *Id.* Reading the complaint and making all reasonable inferences in favor of Plaintiffs, it appears the Defendants have articulated their purpose to "lock up and close" and to "padlock" WFF. **Complaint, ¶ 49.** To achieve this purpose, Defendants launched a series of child abuse investigations against Plaintiffs and enticed children to leave WFF. *Id.,* **¶¶ 53, 63, 64, 65, 68.** These allegations clearly describe governmental attempts, founded on illegitimate motivations, to stop WFF members from assembling to worship. Therefore, this claim will not be dismissed.

### 8.     Violation of due process.

The Court interprets the complaint and briefs to state that Plaintiffs' due process claim is a substantive one, not a procedural one. Plaintiffs state that "Defendants misunderstand the nature of plaintiff[s'] due process claim . . . . Plaintiffs claim a denial of the substantive due process guarantee that parents may raise their children as they see fit." **Plaintiffs' Opposition,**

**at 21 n.11.** The Court has addressed this substantive due process claim and concluded that it is properly pled in Plaintiffs' second cause of action. There is no need to repeat it here. Therefore, this claim will be dismissed.

### 9. Civil rights conspiracy.

Plaintiffs claim that the Defendants' actions constitute a conspiracy to deprive them of their civil rights in violation of 42 U.S.C. § 1985(3). The Supreme Court has held that a plaintiff making this claim must allege (1) a conspiracy, (2) to deprive a person or class of the equal protection of the laws or of equal privileges and immunities under the laws, and (3) an act in furtherance of the conspiracy, (4) that injures the person or deprives him or her of a right or privilege. *See Griffen v. Breckenridge,* **403 U.S. 88, 102-03 (1971).**[1] The *Griffen* Court declined to resolve the issue of "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable" under the statute. *Id.,* **at 102 n.9.** However, the Fourth Circuit has stated that "religious discrimination . . . falls within the ambit" of the statute. *Ward v. Connor,* **657 F.2d 45, 48 (4ᵗʰ Cir. 1981).** Since the Fourth Circuit has held that conspiracies based on religious animus may invoke § 1985(3), the dismissal of Plaintiffs' Equal

---

[1]The first element is actually that the Defendants "did conspire or go in disguise on the highway or on the premises of another." *Griffen, supra,* **at 102.** This Court will follow the example of numerous other courts and give meaning to the disjunctive "or" after the word "conspire." *See, e.g., Larson by Larson v. Miller,* **76 F.3d 1446 (8ᵗʰ Cir. 1996);** *Griffen v. City of Clanton, Ala.,* **932 F. Supp. 1359 (M.D. Ala. 1996);** *Mass v. McClenahan,* **893 F. Supp. 225 (S.D.N.Y. 1995).** Therefore, Plaintiffs alleging a conspiracy need not allege that Defendants went in disguise on the highway or on the premises of another.

Protection claim as being redundant of their Free Exercise claim does not preclude them from seeking relief under this statute.

Plaintiffs have alleged agreements and concerted actions among DSS workers and between DSS workers and former WFF members to discourage Plaintiffs from practicing their religion and to entice Plaintiffs' children to reject their parents' faith. **Complaint, ¶¶ 4, 45, 47, 51, 53, 65.** For example, Plaintiffs have alleged that DSS agreed with Shana Muse, who had lost custody of her children, to return her children to her in exchange for her cooperation with DSS against WFF. *Id.,* **¶¶ 45, 51.** Plaintiffs have further alleged that Defendants smuggled a note to Cody Hawkins from Wellspring enticing him to leave WFF. *Id.,* **¶ 65.** The alleged threats and harassment clearly constitute injuries to Plaintiffs. Therefore, Plaintiffs have properly alleged a cause of action under 42 U.S.C. § 1985(3).

**D.      Qualified immunity.**

The issue of whether government officials are entitled to qualified immunity requires a two-part analysis. Courts must first determine whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [Defendants'] conduct violated a constitutional right[.]" *Saucier v. Katz,* **533 U.S. 194, 201 (2001).** If the Court determines that there has been no constitutional violation, then there is no need to determine whether the defendant is entitled to immunity. *Id.* If, however, the Court finds that the plaintiff has properly alleged a constitutional violation, it must determine "whether the [violated] right was clearly established." *Id.* Unless the right is a "clearly established statutory or constitutional right[] of

which a reasonable person would have known," the government official will be shielded from liability. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). However, this immunity applies only to federal claims; it does not protect governmental officials from claims founded on state law. *See Richardson v. Orangeburg Sch. Dist. No. 1,* 53 F.3d 329 (table), 1995 WL 255941, **3 n.2 (4th Cir. 1995); *Nelson v. Prison Health Servs. Inc.,* 991 F. Supp. 1452, 1465 (N.D. Fla. 1997) (citing *Davis v. Monroe County Bd. of Educ.,* 120 F.3d 1390, 1409 (11th Cir. 1997) ("[Q]ualified immunity does not shield officials from liability grounded on state law.")). The Court will now apply these rules to each of Plaintiffs' claims.

Plaintiffs bring their first claim, entitled "Free Exercise of Religion," under both the United States and the North Carolina Constitutions. The Court finds that a reasonable DSS agent would know that initiating sham investigations motivated by religious animus and enticing children to reject their parents' faith violates a clearly established right to exercise one's religion. By characterizing Defendants' actions so harshly, the Court does not imply that Defendants did, in fact, act in such a manner, but, for the purpose of this motion, the Court must view the allegations in a light most favorable to the Plaintiffs. Therefore, Defendants are not entitled to qualified immunity as to Plaintiffs' first claim.

Plaintiffs bring their claim for "Right to Familial Relations" under both the state and federal constitutions. While the right to familial privacy has been clearly established by the courts, "the precise strictures of [this] penumbral right" are far from well defined. *Hodge, supra,* at 167. Furthermore, for DSS workers to serve the legitimate state interest of protecting children, they must infringe, to some degree, on families' privacy rights. To expect DSS workers to forecast exactly how courts will weigh the right to familial privacy against the state's interest

in protecting children would stifle those workers' initiative and would have seriously adverse consequences for the children of North Carolina. The Court does not expect DSS workers "to resolve what reasonable jurists have long debated" and grants the individual Defendants qualified immunity as to the federal claims stated in Plaintiffs' second cause of action. *Id*. Of course, qualified immunity does not protect Defendants against the state constitutional claims.

Plaintiffs entitle their third cause of action "Denominational Preference." Here, Plaintiffs claim violations of the Establishment Clause of the United States Constitution and violations of the North Carolina Constitution. The actions on which this claim is based, such as Defendants' occasionally mentioning their own faith while interviewing Plaintiffs' children and forcing Plaintiffs' children to listen to "Christian music," are actions that may constitute constitutional violations, but they are not so egregious that one should expect a reasonable DSS worker to anticipate the constitutional questions that his or her actions may raise. Therefore, the Court grants the individual Defendants qualified immunity as to the federal claims stated in Plaintiffs' third cause of action.

Plaintiffs' fifth cause of action is for unreasonable searches and seizures under both the United States and the North Carolina Constitutions. In determining that Plaintiffs have properly stated a claim, the Court relies on non-binding precedent from another judicial circuit that was decided after many of the events giving rise to this suit had occurred. *See, Doe v. Heck, supra*. Furthermore, the Fourth Circuit has held that searches conducted by social workers are not subject to the same scrutiny as searches in the criminal context, and that Court has never precisely articulated the standard by which those searches are to be judged. *Wildauer, supra*. The Defendants had very little judicial guidance as to the propriety of their searches and seizures.

Therefore, the Court will grant the individual Defendants qualified immunity as to the federal claims stated in this cause of action, but will retain jurisdiction over the state constitutional claims.

Plaintiffs' sixth cause of action, brought under both the federal and state Constitutions, is for free speech violations. Again, for the purpose of this motion, the Court must assume that Defendants attempted to regulate the volume of Plaintiffs' speech and to shield Plaintiffs' children from certain types of speech because Defendants' disapproved of such speech. *See* **Complaint, ¶ 53.** Any reasonable DSS worker should know that the government may not proscribe or modify speech because of disagreement with its message. *See **Ward, supra.*** Therefore, qualified immunity as to this cause of action is inappropriate.

Plaintiffs bring their seventh cause of action, entitled "Freedom of Association," only under the United States Constitution. The right of citizens to come together and practice their religion is clearly established. ***Roberts, supra.*** Any reasonable DSS worker should know that threatening to "padlock" a church would violate this clearly established right. Therefore, qualified immunity does not protect the individual Defendants as to this cause of action.

Plaintiffs' bring their ninth cause of action, entitled "Civil Rights Conspiracy," under federal statutory law. The Supreme Court and the Fourth Circuit have clearly laid out the elements of this tort in *Griffen* and *Ward* discussed *supra*. Plaintiffs have alleged that Defendants violated each element of this tort. Any reasonable DSS worker should know that it is impermissible to conspire with former WFF members in an attempt to undermine religious

liberties. Therefore, qualified immunity does not protect the individual Defendants from this cause of action.

Because the Court grants the motion to dismiss as to the Plaintiffs' fourth and eighth causes of action, there is no need to consider Defendants' qualified immunity argument regarding those claims.

## E.     Municipal liability and official capacity claims.

Defendants assert that Plaintiffs' claims for liability on the part of DSS and all Defendants in their official capacities are barred because Plaintiffs have not alleged that any illegal actions were taken pursuant to county or DSS policies or customs. **Defendants' Reply to Plaintiffs' Opposition to Motion to Dismiss, filed March 5, 2004, at 14-16.** The Supreme Court has held that municipalities may not be sued for federal constitutional deprivations on the theory of *respondeat superior* or be held liable for those deprivations unless "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Social Servs. of the City of New York,* **436 U.S. 658, 691, 694 (1978).** Furthermore, "municipal liability can only ensue when an injury is caused by the execution of a municipal policy or custom when that policy or custom is a result of 'policy maker fault of at least the degree of deliberate indifference to or reckless disregard for the constitutional rights of persons. . . .'" *Sigman v. Town of Chapel Hill,* **161 F.3d 782, 788 (4th Cir. 1998) (quoting** *Spell v. McDaniel,* **824 F.2d 1380, 1390 (4th Cir. 1987)).** However, the Supreme Court has cautioned that "local

governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell, supra,* **at 690-91.**

Defendants correctly state that Plaintiffs' allegations involve *deviations* from official policies, not actions taken in compliance with those policies. Plaintiffs actually claim that "defendants have not followed North Carolina law, state DSS policy, or their usual practices because their aim has been to subvert plaintiffs' protected religious practices." **Complaint, ¶ 78.** However, Plaintiffs allege the Defendants have repeatedly violated their constitutional rights over the past decade. It is difficult to characterize these alleged actions as anything other than a decade-long "governmental 'custom' . . . [that] has not received formal approval through the body's official decisionmaking channels." *Monell, supra.* One may still argue that the Defendants responsible for these deprivations lacked policy-making authority. However, that challenge would fall flat because "[c]onstructive knowledge [of the local government] may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities[,] the governing body should have known of them." *Spell, supra,* **at 1387.** Here, even if the Defendants whose actions allegedly deprived Plaintiffs of their constitutional rights are not "policy makers," the policy makers within DSS clearly had constructive knowledge of the widespread and flagrant violations that occurred over such an extended time period.

Since Plaintiffs have pled facts to support a finding that official policy makers had constructive knowledge of the unconstitutional practices, Plaintiffs may proceed with their federal municipal liability and official capacity claims if they allege "failure [on the part of the

policy makers], as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." *Id.,* at 1391. Clearly, Plaintiffs' allegations lead to the conclusion that official policy makers did nothing to correct or stop the alleged deprivations. However, in order for the policy makers to act with deliberate indifference toward constitutional rights, those rights must be clearly established. *Williamson v. City of Virginia Beach, Va.,* **786 F. Supp. 1238 (E.D. Va. 1992),** *aff'd,* **991 F.2d 793 (4th Cir. 1993);** *see also, Joyce v. Town of Tewksbury, Mass.,* **112 F.3d 19, 23 (1st Cir. 1997).** Therefore, the issue of municipal and official capacity liability in this case will necessitate the same reasoning as did the qualified immunity issue. Since the deprivations alleged in the first, sixth, seventh, and ninth causes of action involve clearly established rights as discussed *supra,* the Plaintiffs have alleged facts sufficient to support a finding of deliberate indifference in these causes of action. The federal constitutional claims against DSS and against all Defendants in their official capacities stated in those causes of action will survive this motion. The other federal constitutional claims against those Defendants will be dismissed since Plaintiff cannot prove deliberate indifference.

The Court finds no precedent for dismissing state law claims pursuant to *Monell. Cf., Carter v. Morris,* **164 F.3d 215 (4th Cir. 1999) (analyzing municipal liability for federal claims under *Monell* but separately analyzing municipal liability for violations of state law).** If the Defendants have not waived sovereign immunity by purchasing liability insurance, that doctrine may bar some of Plaintiff's state constitutional claims. *See* **N.C. Gen. Stat. § 153A-435.** However, sovereign immunity is an affirmative defense. *Mullis v. Sechrest,* **126 N.C. App. 91, 95, 484 S.E.2d 423, 425 (1997),** *rev'd on other grounds,* **347 N.C. 548, 495 S.E.2d 721 (1998).** Therefore, it must be raised by the Defendants. **Fed. R. Civ. P. 8 (c).** For

that reason, the Court will not address the issue of sovereign immunity and will retain jurisdiction over all state constitutional claims except for those stated in the fourth and eighth causes of action, which will be dismissed for the reasons stated *supra*.

**F.     Injunctive and declaratory relief.**

Defendants claim that Plaintiffs are not entitled to declaratory or injunctive relief. Defendants give no reason why Plaintiffs are not entitled to declaratory relief and argue they should not obtain injunctive relief because there is not a sufficient likelihood that Defendants will violate Plaintiffs' rights in the future. However, many of the investigations Plaintiffs claim to be unconstitutional are ongoing. Clearly, there is a likelihood Defendants will continue these investigations and the numerous tactics that Plaintiffs allege to be unconstitutional will also continue. Therefore, the Court will not dismiss Plaintiffs' claims for declaratory and injunctive relief.

**G.     Request for oral argument.**

Since the parties have thoroughly briefed the issues presented in this motion, oral argument is not necessary.

## III. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion to dismiss is hereby **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiffs' fourth and eighth causes of action are hereby **DISMISSED WITH PREJUDICE** in their entirety.

**IT IS FURTHER ORDERED** that Plaintiffs' federal claims as stated in Plaintiffs' second, third, and fifth causes action are hereby **DISMISSED WITH PREJUDICE** as to all Defendants.

**IT IS FURTHER ORDERED** that Plaintiffs' request for oral argument is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Court will retain jurisdiction over Plaintiffs' federal claims stated in Plaintiffs' first, sixth, seventh, and ninth causes of action and over Plaintiffs' state claims stated in Plaintiffs' first, second, third, fifth, and sixth causes of action.

**IT IS FURTHER ORDERED** that, within 30 days after the filing of responsive pleadings, the parties shall submit their report of initial attorneys' conference containing their discovery proposals for this matter.

**THIS** the _____10th_____ day of June, 2004.


_LACY H. THORNBURG_
**LACY H. THORNBURG**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
for the
Western District of North Carolina
June 10, 2004

* * MAILING CERTIFICATE OF CLERK * *

Re: 1:03-cv-00298

True and correct copies of the attached were mailed by the clerk to the following:

Scott D. MacLatchie, Esq.
Womble, Carlyle, Sandridge & Rice
3500 One Wachovia Center
301 South College St.
Charlotte, NC 28202-6025

Christopher J. Klatell, Esq.
Rabinowitz, Boudin, Standard, Krinsky & Liberman, P.C.
740 Broadway at Astor Place
Fifth Floor
New York, NY 10003-9518

Roger Bearden, Esq.
Rabinowitz, Boudin, Standard, Krinsky & Liberman, P.C.
740 Broadway at Astor Place
Fifth Floor
New York, NY 10003-9518

David B. Goldstein, Esq.
Rabinowitz, Boudin, Standard, Krinsky & Liberman, P.C.
740 Broadway at Astor Place
Fifth Floor
New York, NY 10003-9518

Eric M. Lieberman, Esq.
Rabinowitz, Boudin, Standard, Krinsky & Liberman, P.C.
740 Broadway at Astor Place
Fifth Floor
New York, NY 10003-9518

John W. Gresham, Esq.
Ferguson, Stein, Chambers, Adkins, Gresham & Sumter
741 Kenilworth Ave.
Suite 300
Charlotte, NC 28204

cc:
Judge                    ( ✓ )
Magistrate Judge         ( )
U.S. Marshal             ( )
Probation                ( )
U.S. Attorney            ( )
Atty. for Deft.          ( )
Defendant                ( )
Warden                   ( )
Bureau of Prisons        ( )
Court Reporter           ( )
Courtroom Deputy         ( )
Orig-Security            ( )
Bankruptcy Clerk's Ofc.  ( )
Other_____     ( )

Date: _6/10/04_

Frank G. Johns, Clerk

By: _E. Barton_
     Deputy Clerk